UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SETH WELCH,

                Petitioner,               Case No. 2:24-cv-11720

v.                                  HONORABLE GERSHWIN A. DRAIN

JEFFERY TANNER,

                Respondent.


## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS

### I. INTRODUCTION

Seth Welch, a Michigan prisoner, filed this habeas case under 28 U.S.C. § 2254. Welch challenges his 2020 Kent Circuit Court jury trial conviction of first-degree child abuse and first-degree murder resulting from the starvation death of his infant daughter. Welch asserts that insufficient evidence was presented at trial to sustain his child abuse conviction and that he was denied the effective assistance of counsel. For the reasons that follow, the Court denies the petition, denies a certificate of appealability, and denies leave to appeal in forma pauperis.

## II. **BACKGROUND**

Welch and his wife, Tatiana Fusari, lived on a small farm in rural Kent County, Michigan. (ECF No. 9-4, "T III," at 92.)[1] In October 2017, Fusari and Welch were expecting their third child. (ECF No. 9-3, "T II," at 12-13.) The couple already had a two-year-old son and a three-year-old daughter. Thirty-seven weeks into her pregnancy Fusari gave birth at home to a 6 lbs. 14 oz. baby girl, Mary Welch. (ECF No. 9-5, "T IV," at 13-16.) A midwife arrived shortly after the birth. She examined Mary and noted no health concerns. (*Id.*)

During her short life, visitors to the Welch farm were troubled by Mary's condition. Patricia Marvin, a friend from church, testified that in January or February 2018, she was at the farm and saw that Mary "hadn't grown very much, if at all." (T III, at 110.) Fusari explained that it was normal because Mary had been premature.[2] (*Id.*)

By June, when Marvin held Mary at a barbecue at the farm, Mary "was just small, very small, and I could feel her spine... It just didn't feel normal... it was just breaking my heart that she was so small, and you know, maybe she could have

---

[1] Fusari was convicted of first-degree child abuse and first-degree murder in a separate proceeding. *See People v. Fusari*, No. 359610, 2023 Mich. App. LEXIS 2030 (March 23, 2023).

[2] Laura Slater, the midwife who assisted after the birth, testified that she never told Welch or Fusari that Mary was premature, as Mary was delivered full-term. (T IV, at 15-16.)

benefitted from getting help or getting checked out." (*Id.* 114-117.) When Marvin asked about medical care, Fusari admitted that they hadn't taken Mary to a doctor. (*Id.* 117.) Marvin didn't call CPS because she trusted that God would help. (*Id.* 118.)

Tamara Flowers testified at trial that she stayed at the farm for a few days in July 2018 with her boyfriend and their two-year-old son. Flowers's boyfriend planned to work with Welch on the farm. They arrived one afternoon after meeting with Welch and Fusari at a Burger King. The adults and other children ate dinner together, but Flowers never saw Mary during the first day of their stay. (T III, at 19-44.)

The second day at around noon, before Fusari left for her work at a McDonalds Restaurant, Flowers saw Mary for the first time. Fusari was sitting outside by a tree breastfeeding her. (T III, at 20-29.) Flowers was struck by Mary's condition: "The baby was very small, like skinny small. And her face was like very, very slim. Like her cheeks almost looked sunken." (*Id.*) The baby looked like a one-month-old to Flowers. Flowers remarked to Fusari about Mary's size, but Fusari explained (again falsely) that Mary had been premature. (*Id.*)

After Fusari went to work, Welch put Mary in a stroller and sat her in the hot July sun by the chicken coup. Welch sat at a distance and recorded a religious video to post online while the three other children played with a hose. Eventually everyone went inside but Mary. About an hour later, Flowers asked her boyfriend whether

Mary had been left outside. Overhearing the comment, Welch came out of his bedroom, retrieved Mary, and put her in her bedroom. (*Id.* at 31-34.) Fusari later came home with food from McDonalds. Everyone again ate together except for Mary, who was left in her room. (*Id.* 37.) Flowers never saw Mary again. (*Id.* 35-36.)

Flowers testified that she only saw Mary for the one period when she was left in the sun. (*Id.* 40.) Flowers was disturbed by Mary's lack of vitality: "I never really seen her move other than her turn her head a little bit... No physical movement at all – but her head." (*Id.* 41.) Flowers "[n]ever heard her cry. Never made a noise. Nothing from her at all." (*Id.*)

Flowers also never saw Welch or Fusari go into Mary's room to feed her during their three-day stay. (*Id.* 36.) Flowers was concerned and wanted to call CPS, but her boyfriend told her not to call because they were homeless at the time and needed a place to stay. (*Id.* 43-44.)

Flowers and her family left around noon on the third day. Welch had learned that they were unmarried, and they were no longer welcome at the farm. (*Id.* 38-40.)

Welch's mother, Judy Bregman, testified that she saw Mary perhaps twice that July. She told her son to take Mary to a doctor, but Bregman didn't call CPS or a doctor herself. (*Id.* at 98-100.)

Anna Pitz testified that she worked at a farm supply store and saw the Welch family about twice a week at the store between February and July 2018. Pitz described Mary as "very small and fragile," and "very, very thin." (T III, 124-25.) Pitz visited the farm once to see about their home church. Pitz never heard Mary make any kind of noise. (*Id.* 126-27.)

As Mary's condition worsened during her short life, Welch's text messages to Fusari while she was at work revealed his hostility to his infant daughter. "I can't deal with babies," Welch texted. (T IV, at 32.) "I'm not a mom. This isn't my job." (*Id.* at 35.) On May 13, Welch texted Fusari: "I can't deal with Mary tonight. She is being a total cunt. Can you get out early or something because it's wild. I'm about to fuck her up. I gagged her for a bit. It's bad." (*Id.* at 38.)

Mary's last day of life was August 1, 2018. That afternoon, Fusari put Mary in her crib around 3:00 p.m. before leaving for work. (T II, at 36.) Welch told police that he did not take Mary out of her crib to feed or change her a single time after Fusari left for work, but he checked on her by looking through the peep hole in her door. (*Id.* at 26-27.) Mary remained in her crib unattended for close to 20 hours.

Mary's body finally gave in. Sometime around 10:00 a.m. on the morning of August 2, Fusari found Mary in her crib unresponsive. (T III, at 82.) Welch's first call was to his "attorneys" who also happened to be his mother and father. (T II, at 10, 26, 28, 32.) Meanwhile, Fusari called McDonalds so she wouldn't be penalized

at work. Over two hours later Welch finally called 9-1-1 to report that his daughter was "dead as a doornail." (*Id.* at 10.) When asked how he was doing, Welch said, "You know, it's just another day. It is what it is." (*Id.*)

During the two-hour period before calling 9-1-1, cellphone records indicated that it was indeed "just another day" for Welch. He had sent and received texts about selling a goat, saying that he was "available anytime" to complete the transaction. He also spent time on his phone looking at celebrity news stories. (T IV, at 41-43.)

Emergency personnel described what they found when they arrived at the farm. Detective Jason Russo was overcome: "[W]e entered into the baby' s room. And I was not prepared for what I saw. I walked over to the crib. I observed the baby. I was shocked. I immediately started crying.... I've seen a lot of things in my career, and… I knew that I was going to see a dead child. I thought I was going to see a fairly normal baby…. I have been to several other child death cases, and that was not what I expected…. It was indescribable. I can't forget it to this day." (T III, at 63-64.)

Mary was found in her crib in dirty clothing, covered by blankets soiled with animal blood and black mold, and laying on a mattress that was moldy, torn, and so badly soaked through that it was dripping liquid into a puddle under the crib. (T II, 68-69, 71, 73-77; T III, at 104-05.)

NICU nurse and EMT responder Britt Roberts testified, "We had gotten called to a 10-month old, and we were questioning did we get called to 10-month old or a 10-day old, because she was the size of a newborn. I had estimated her to be about eight pounds." (T II, at 35.)

Welch showed no signs of grief. Leonard Misner from the victim services team testified that he approached Welch with condolences: "I said, 'first and foremost, I'm very sorry for your loss.' To which Mr. Welch looked at us and went 'Ah, life goes on.'" (T III, at 15.) Misner, a veteran responder, was stunned: "I've seen a lot of things in my different careers. This is one that I will never, for the rest of my life, forget. It was, in my opinion, the coldest, most detached response from anyone I've ever seen. There was no sign of any sorrow whatsoever." (*Id.*) Detective Russo recalled Welch explaining that "it is what it is." (*Id.* at 62.)

Officers inspecting the house found that the older two children shared a dirty room that had no sheets, no bed pillows, and filthy mattresses. (T II, at 57.) Rodent feces were everywhere in the house. The parents' room, on the other hand, was air conditioned and in better condition. (*Id.* at 60-63.)

Along with the appalling condition of her crib, there were bags of trash in Mary's closet, including a large bag containing over 120 soiled diapers. Officers went through each diaper. Only one had solid feces, which were "granular, almost like if you were to take coffee grounds out of a coffee maker." The limited solid

feces and their constitution indicated that Mary had suffered from severe malnutrition. (T III, at 130-139.)

Meanwhile, investigators found abundant food for the rest of the family throughout the house. Both the refrigerator and freezer were full of food, and canned and dry goods were found in the kitchen. (T II, at *Id.* at 50-52, T III, at 132.) The only baby food found was a single Beechnut Rice container. (*Id.* at 53.)

The autopsy revealed the extent of Mary's condition. The pathologist testified that in his decades of practice he had never seen a case this extreme: "I've certainly had cases where I've had dehydration and malnutrition. I don't recall specifically a case to this degree of severity." (T IV, at 91.) At nearly ten months old, Mary weighed only eight pounds. (*Id.* at 58, 60, 84.) The pathologist testified that Mary was extremely malnourished and dehydrated. (*Id.* at 83.) Her condition showed "extreme malnutrition resulted in muscle wasting... the bones [were] very obvious underneath the skin due to the lack of both fatty tissue underneath the skin and the muscle wasting." (*Id.* at 84.) The bones themselves were "very, very thin." (*Id.* at 94.) "The spine was visible… by looking at her back." (*Id.* 84-85.) Mary had less than 1/16th inch of body wall fat. (*Id.* at 91.)

Mary's body displayed no signs of rigor mortis: "If you don't have much muscle, because of the wasting or the atrophy, then you're not going to develop much in the way of rigor mortis." (*Id.* at 85.) Mary's internal organs were undersized but

otherwise able to function. Her death was not the product of some other disease. (*Id.* at 95-97.)

At the time of her death, Mary's body was consuming itself to the very bones: "The bone marrow produces cells -- produces our red blood cells, as well as our white blood cells, and so, with chronic malnutrition you don't have the nutrients, the bone marrow is not producing those cells. And so, it becomes more - instead of being very full of these cells that are producing white blood cells and red blood cells, the marrow gets partially replaced by fatty tissue." (*Id.* at 96.)

The pathologist emphasized that Mary wasted away over an extended period in a way that would have been obvious to her caregivers. "The loss of weight overall to her body, which includes the internal organs, is a process that's going to take weeks to occur. Especially to this degree." (*Id.* at 89-90.) Mary had become so weak that "most movements would be very difficult" and even "turning her head would be difficult." (*Id.* at 98-99.) "It was obvious she was extremely malnourished," the pathologist believed. (*Id.* at 83.) He concluded that the "diagnosis for cause of death is malnutrition with dehydration due to neglect by an adult caregiver" with the manner of death ruled "homicide" (*Id.* at 100.)

The jury found Welch guilty of first-degree child abuse and first-degree murder based on this evidence, and he was sentenced to mandatory life imprisonment.

Following his conviction and sentence, Welch filed a claim of appeal in the Michigan Court of Appeals. His appellate counsel filed a brief on appeal that raised two claims:

> I. There is insufficient evidence that Seth Welch committed first-degree child abuse.
>
> II. Trial counsel was ineffective for failing to request an expert to contextualize and explain Seth's conduct and demeanor after MA's death. Trial counsel was likewise ineffective for failing to object to the prosecutorial error in misstating the law, particularly as it relates to the lesser included offenses on which the jury was instructed.

(ECF No. 9-8, PageID.837.)

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Welch*, No. 357501, 2022 WL 16858008 (Mich. Ct. App. Nov. 10, 2022); (ECF No. 9-8, PageID.761-63.) Welch raised the same claims in the Michigan Supreme Court, but his application for leave to appeal was denied by standard form order. *People v. Welch*, 993 N.W.2d 830 (Mich. 2023) (Table); (ECF No. 9-9, PageID.943.)

Welch's habeas petition raises the same two claims he presented to the state courts on direct review. (ECF No. 1, PageID.5-7.)

### III. STANARD OF REVIEW

Title 28 U.S.C. § 2254(d) limits federal habeas review of claims that were adjudicated on the merits by the state courts. A habeas petitioner must demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable

10

application of" clearly established Supreme Court law. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

Under this standard a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**IV. <u>ANALYSIS</u>**

<u>A. Sufficiency of the Evidence</u>

Welch's first claim asserts that insufficient evidence was presented at trial to sustain his first-degree child abuse charge, the predicate felony for his first-degree felony murder conviction. Specifically, Welch asserts that insufficient evidence was

presented to prove that he knowingly or intentionally caused serious physical or mental harm to Mary. (ECF No. 9-8, PageID.850-51.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). The clearly established test for whether sufficient evidence was presented at trial to sustain a conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A reviewing court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19 (citation and footnote omitted).

A federal court reviewing a state court's rejection of a sufficiency of the evidence claim cannot overturn it simply because the federal court disagrees with the state court's conclusion. Instead, a federal court may grant habeas relief only if the state court decision amounted to an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011). On review of a state court decision rejecting a sufficiency of the evidence claim, the only question "is

whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

The rejection of this claim on the merits by the Michigan Court of Appeals easily clears AEDPA's deferential standard of review. The Michigan Court of Appeals first outlined the elements of first-degree child abuse, including the challenged mental state element:

> "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child." MICH. COMP. LAWS § 750.136b(2).… "Because it is difficult to prove an actor's state of mind, the prosecution may rely on minimal circumstantial evidence to prove that the defendant had the required mental state." *People v. McFarlane*, 325 Mich. App. 507, 516 (2018). "Intent and knowledge can be inferred from one's actions." *People v. Gould*, 225 Mich. App. 79, 87 (1997).

*Welch*, No. 357501, 2022 WL 16858008, at *1. The state court went on to recount the evidence that proved beyond a reasonable doubt that Welch knowingly caused Mary's death through malnourishment:

> In this case, the jury was presented with several of defendant's text messages to his wife complaining about his infant daughter. In one instance, for example, defendant wrote, "I can't deal with [the child] tonight. She is being a total cunt. Can you get out early or something because it's wild. I'm about to fuck her up. I gagged her for a bit. It's so bad." In addition to this shockingly callous and malicious text message, photos were extracted from defendant's phone that showed that he was checking on his daughter through the peephole of her bedroom door (rather than actually going into the room), and one detective testified that defendant had told him during an interview that he would not go near the peephole if things were quiet. It was also testified that defendant did not take his daughter to the doctor, even though he supposedly expressed concerns regarding her weight. Based

> on this and other evidence of a similar character, a rational jury could
> reasonably infer from defendant's consistent disregard of his infant
> daughter's basic needs that defendant knowingly caused her death
> through malnourishment and dehydration.

*Id.*

The clearly established standard requires a reviewing court to view the evidence in the light most favorable to the prosecution. As indicated by the state court, to show that Welch acted with the requisite mental state to commit first-degree child abuse under Michigan law, the prosecutor was required to prove that he "knowingly or intentionally cause[d] serious physical harm or serious mental harm to a child." § 750.136b; *See also People v. Maynor*, 470 Mich. 289 (2004).

Viewed most favorably to the prosecution, the evidence presented at trial allowed the jury to find beyond a reasonable doubt that Welch intended or knew that his nearly complete failure to care for or feed Mary would result in serious physical harm or death. Eyewitnesses and medical experts testified that Mary's deteriorating condition was obvious. And it was a condition that deteriorated over the course of weeks or months. A search of the house and other eyewitness testimony indicated that Welch, Fusari, and the two other children had adequate food and ate together, whereas Mary was often left to languish alone in her crib. Finally, Welch's text messages indicated his open hostility to Mary's existence, and his conduct after her death corroborated the evidence of his indifference to whether she lived or died.

From this evidence, viewed most favorably to the prosecution, the jury could easily infer beyond a reasonable doubt that Welch was consciously aware that Mary was wasting away due to his lack of care, and that he made a conscious, knowing decision to let his helpless infant daughter starve to death. The state court's conclusion that sufficient evidence was presented to sustain his first-degree child abuse conviction did not "fall below the threshold of bare rationality[;]" therefore, Petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

B. Ineffective Assistance of Counsel

Petitioner argues in his second claim that his trial counsel was ineffective for: (1) failing to call an expert witness to explain how Welch's demeanor after Mary's death might not have indicated callous indifference, and (2) failing to object to prejudicial comments made by the prosecutor regarding the applicability of lesser included offenses.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). Under *Strickland*, a defendant must establish that his counsel's performance was deficient and that he was prejudiced by his counsel's deficient performance. *Id.* at 687-88. When evaluating counsel's performance under *Strickland's* first prong, the reviewing court must apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Id.* at 690. *Strickland's* prejudice prong requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

According to the Supreme Court, "[t]he standards created by *Strickland* and § 2254 are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S.111, 113 (2009)).

Both allegations of ineffective assistance of counsel raised by Welch were rejected on the merits by the Michigan Court of Appeals. With respect to the failure to call an expert witness, the state court found that Welch failed to demonstrate *Strickland* prejudice:

> Defendant argues that his trial counsel should have called an expert witness experienced in mental health and "complicated grief" to rebut the prosecutor's narrative that defendant had no concern for his infant daughter when describing defendant's actions after she was found dead. Defendant has not shown, however, that calling or consulting with a mental-health expert experienced in "complicated grief" would have assisted his defense or that there is a reasonable probability that the outcome of his trial would have been different. Moreover, the record shows that defense counsel elicited testimony that defendant's demeanor at the scene could be attributable to shock. Defense counsel also cross-examined witnesses to challenge their assertion that defendant was acting unusual and elicited testimony that defendant had at times displayed a more typical response to the child's death. Therefore, defendant's claim of ineffective assistance of counsel

16

regarding his counsel's alleged failure to call or consult a mental-health expert witness fails.

*Welch*, 2022 WL 16858008, *2.

This decision reasonably applied the *Strickland* standard. Welch supported this allegation in the state courts with a scholarly article about the different ways a person might manifest grief, (ECF No. 9-8, PageID.866-75), and with statements he made when he was evaluated for criminal responsibility at the Center for Forensic Psychiatry. (*Id.* PageID.888-907.) Welch failed to support the claim, however, with an affidavit or proposed testimony from an expert witness who was willing to testify on his behalf in the manner he describes.

Criminal defendants face an uphill battle in bringing a *Strickland* claim that hinges on a purported failure to call an expert witness. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021). Trial counsel's strategic decision regarding whether to hire an expert is entitled to a "strong presumption of reasonableness." *Id.* The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

The Michigan Court of Appeals reasonably determined that Welch failed to show that the absence of an expert prejudiced him. Welch claims that an expert would have testified that his reaction to Mary's death did not necessarily reflect his indifference, but he failed in state court (and fails here) to show that there is an expert

17

witness that exists who would have presented such testimony. This failure alone provided a reasonable and sufficient basis for rejecting the claim under *Strickland*. *See, e.g., Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) ("[The petitioner] has offered no evidence, beyond his assertions, to prove what the content of [the] testimony would have been; a fortiori, he cannot show that he was prejudiced by its omission. . . . And even accepting [the petitioner's] assertion as to [the] testimony, he offers no basis to conclude that, in light of the other evidence presented at trial, it would likely have altered the outcome."); *See also Lagrone v. Parris*, No. 23-5177, 2023 U.S. App. LEXIS 20470, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) (habeas petitioner failed to prove *Strickland* prejudice where he failed to identify expert his trial counsel could have called).

In any event, even if counsel had secured an expert to opine that Welch's reaction at the scene did not demonstrate callous indifference, the evidence presented at trial showing that he knowingly chose to let his daughter starve to death rather than feed her was overwhelming. There is no reasonable probability that expert testimony regarding his reaction to Mary's death would have altered the outcome of his trial.

Next, Welch asserts that his counsel was ineffective for failing to object to statements made by the prosecutor regarding his reaction to Mary's death and the applicability of lesser included offenses. Specifically, Welch asserts that his counsel

was ineffective for failing to object to the following two comments made in closing

and rebuttal arguments:

> [W]hat does he say to the 911 call? "Oh, it's just another day." First officer on the scene, "Tell me what happened." "Well, not really much." Don't tell me it's shock, because this is a couple of hours later, and he had four interviews across this -- in a couple days span. Did you ever hear emotion? Did you ever hear sadness?

> He says to the Special Advocate on the scene "It's just another day." You have all these medical people, and all these veteran officers, and people on the scene who are like it was like nothing. I've never seen anything like it. The coldness. He talks about natural selection when talking about his own child. Yeah, she's small. Some - some babies die.

(T V, at 12).

***

> Involuntary manslaughter is like when you have a pool, and your child is outside, and you know you should be watching your child all the time, and you go inside, and your child drowns. It's horrible, preventable. But, it was an involuntary thing. That is not this case. This is not in any way involuntary manslaughter.

> So, then, they want to go to second-degree murder. Well, we always think as [sic] second-degree murder as a kind of a crime of passion. The shaken baby. You know, awful. And again, preventable. But, it's just that quick thing you did. And that one time thing. This is not that. This is chronic. This is torture. This is weeks long. This is not just second-degree involuntary manslaughter. And it sure the heck isn't second-degree child abuse.

(*Id.* at 28).

The Michigan Court of Appeals found that even assuming the comments were improper, Welch could not demonstrate prejudice because the comments were not egregious, and the jury instructions cured any error:

> The trial court had explained to the jury, however, that the attorneys' arguments were not evidence and it would provide final instructions after closing arguments. The trial court also reminded the jury of its oath to return a verdict based only on the evidence and the trial court's instructions on the law.
>
> Assuming for the sake of argument that the prosecutor made a statement to which defense counsel should have objected, defendant cannot show any prejudice by his counsel's failure to object. "Jurors are presumed to follow their instructions and instructions are presumed to cure most errors." *People v. Abraham*, 256 Mich. App. 265, 279 (2003). Although there may be cases in which a prosecutor's egregious misstatements of the law require a new trial, *see e.g., People v. Unger*, 278 Mich. App. 210, 238 (2008), this is not such a case. Any objection by defense counsel would have been futile, given that the prosecutor's statements were not particularly egregious (if egregious at all) and the trial court's instructions cured any alleged defect. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v. Ericksen*, 288 Mich. App. 192, 201 (2010).

*Welch*, 2022 WL 16858008, *2.

This decision was reasonable. The state court assumed for the sake of argument that the comments were objectionable. This Court, however, fails to see why that assumption was warranted. As for the first comment, the prosecutor accurately summarized the testimony of the first responders' recollection of Welch's statements at the scene to support counsel's argument that Welch was indifferent to Mary's death. A prosecutor is given leeway to argue reasonable inferences from the

evidence during closing arguments. *See United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011). The first comment was unobjectionable.

As for the second comment, the prosecutor reasonably contrasted the weeks or months-long conduct of deliberate starvation at issue here with much shorter-term paradigmatic examples of gross negligence or sudden violent reaction. The duration of an event is a proper consideration in determining a defendant's state of mind. *See People v. Townes*, 391 Mich. 578, 590 (1974). The obvious and proper point the prosecutor made was that an action that might start out as one that is grossly negligent or performed in a state of excitement can transform into a deliberate or intentional one with the passage of time. Thus, even if it were true that Welch's initial abandonment of Mary's basic needs started out as an act of gross negligence, with each passing day and week of inaction during which Mary slowly starved to death, Welch's continued inaction in the face of her obvious deterioration transformed into an intent or knowledge that his conduct was gradually killing Mary. The argument was proper.

Counsel was not ineffective for failing to make either meritless objection. *See, e.g., Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

Because Petitioner has not demonstrated entitlement to habeas relief with respect to either of his claims, the petition will be denied.

21

## V. **CERTIFICATE OF APPEALABILITY**

In order to appeal the Court's decision, Welch must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). The applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, jurists of reason would not debate the Court's conclusion that Welch has failed to demonstrate entitlement to habeas relief with respect to his claims because they are devoid of merit. Therefore, a certificate of appealability is denied.

Welch is denied permission to appeal in forma pauperis because any appeal would be frivolous. 28 U.S.C. § 1915(a)(3).

## VI. <u>CONCLUSION</u>

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, and 3) **DENIES** permission to appeal in forma pauperis.

SO ORDERED.

Dated:  September 26, 2025                            /s/Gershwin A. Drain
                                                     GERSHWIN A. DRAIN
                                                     United States District Judge

### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record and on Seth Welch, #620104, Macomb Correctional Facility, 34625 26 Mile Road, Lenox Township, MI 48048 on
September 26, 2025, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager